**CONTINUATION OF A CRIMINAL COMPLAINT**

I, Joseph Mack, being first duly sworn, depose and state as follows:

1. I make this continuation of a criminal complaint in support of a request for an arrest warrant for LAKENTO BRIAN SMITH based on probable cause that beginning on a date unknown but from at least May 30, 2025 through present, SMITH conspired with others, known and unknown, to launder monetary instruments to promote and conceal drug trafficking crimes, in the Western District of Michigan, the Southern District of Texas, and elsewhere, in violation of 18 U.S.C. § 1956(h).

2. I am a Special Agent with the Internal Revenue Service Criminal Investigation (IRS-CI) and have been since 2022. I became a Special Agent with the IRS-CI after receiving approximately 26 weeks of basic training at the Federal Law Enforcement Training Center in Glynco, GA. This training covered many aspects of conducting financial investigations, including but not limited to: a) identifying the means and techniques by which persons engaged in criminal activities derive, launder, conceal, and spend illegally-obtained proceeds and use their businesses and assets to facilitate unlawful activities; b) the preparation of affidavits in tax and non-tax investigations in support of the seizure of financial and tax records, ledgers, books, cash and other valuables, documentation reflecting tax and non-tax violations; and c) reviewing records pertaining to the acquisition and ownership of assets. Additionally, I have been a certified Anti-Money Laundering Specialist since approximately February of 2025.

1

3.      I am a law enforcement officer of the United States within the meaning of Section115(c)(1) of Title 18, United States Code, and empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 1956.

4.      This continuation is based upon my personal knowledge and upon information reported to me by federal and local law enforcement officers and others with knowledge of the case. Unless specifically indicated otherwise, all conversations and statements described in the affidavit are related in substance and in part only. This affidavit does not contain every fact known to me through this investigation, but only those facts necessary to establish probable cause for the requested criminal complaint and arrest warrant.

**RELEVANT TRAINING AND EXPERIENCE**

5.      I know based on my training, experience, and knowledge of this investigation, that it is common for drug traffickers to deposit cash drug proceeds into bank accounts. However, traffickers use criminal tradecraft to conduct deposits without triggering Currency Transaction Reports or Suspicious Activity Reports; both of which increase a trafficker's risk of detection by law enforcement. One strategy employed by traffickers is to structure cash deposits to remain below the $10,000.00 Currency Transaction Report threshold. Structuring activities commonly include making multiple trips to the same institution on the same day or over a course of several days to deposit cash. This activity stands out from lawful banking behavior

because customers with lawful proceeds would be unlikely to make multiple trips to a bank when depositing all the funds at once is far more efficient.

6.      As an IRS-CI Special Agent and Certified Anti-Money Laundering Specialist, I have been trained to identify and trace complex financial networks; supporting a wide range of illegal activity, including; but not limited to drug trafficking. Money laundering is the overarching term for the process of disguising the source of proceeds from illegal activity and making the funds appear legitimate. Money laundering occurs in three primary phases: placement, layering, and integration. Placement refers to a criminal physically disposing of the cash or other asset initially generated from criminal activity thereby introducing the proceeds into the financial system. Layering refers to the separation of illicit proceeds from their source by layers of financial transactions intended to conceal the origin of the proceeds. Placement refers to using the laundered proceeds in seemingly normal transactions to create the perception of legitimacy. Throughout this investigation, I have observed hallmarks of each of the phases of the money laundering process.

## DEFINITIONS

7.      Under 18 U.S.C. § 1956(a)(1)(A)(i), "whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity, with the intent to promote the carrying on of specified unlawful activity . . . shall be sentenced to a fine of not more

than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both."

8.     Under 18 U.S.C. § 1956(a)(1)(B)(i), "whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity, knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity" is subject to the same penalties above.

9.     Under 18 U.S.C. § 1956(h), any person who conspires to commit any offense defined in section 1956, including sections 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i), shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

10.     Under 18 U.S.C. § 1956(c)(4), a "financial transaction" "means (A) a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments, or (iii) involving the transfer of title to any real property, vehicle, vessel, or aircraft, or (B) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree."

11.     Under 18 U.S.C. § 1956(c)(7), the term "specified unlawful activity" means, among other things, any drug trafficking offense that is a felony violation of the Controlled Substances Act, such as 21 U.S.C. §§ 841(a)(1), 843(b), 846.

## PROBABLE CAUSE

12.     SMITH is 55 years old and a current resident of Houston, Texas but formerly from Muskegon County, Michigan. SMITH has two prior state of Michigan felony drug convictions from 1994 and 1996 (controlled substance – delivery/manufacture (cocaine, heroin or another narcotic) less than 50 grams). In 2006, after a four-day jury trial in United States District Court for the Western District of Michigan—Grand Rapids, SMITH was convicted of conspiracy to possess with intent to distribute 500 grams or more of cocaine and 50 grams or more of cocaine base; possession with intent to distribute 500 grams or more of cocaine; and felon in possession of firearms, and sentenced to life in prison (Case No. 1:06-cr-32). On January 17, 2025, the President of the United States commuted SMITH's sentence to expire on July 16, 2025, leaving intact SMITH's 8-year period of supervised release, which SMITH is currently serving and being supervised by the U.S. Probation Office for the Southern District of Texas in Houston. Supervision commenced July 16, 2025.

13.     SMITH lives at 2016 Main Street, Apartment 720, Houston, Texas, 77002, which has been approved by the U.S. Probation Office for purposes of supervision. SMITH lives there with his wife (SMITH's WIFE), whose identity is known to investigators.

5

A.     CO-CONSPIRATOR 1 is a drug dealer who lives in Muskegon County, MI.

14.     CO-CONSPIRATOR 1 (CC-1) is known to SMITH and investigators. CC-1 is a resident of Muskegon Heights, Michigan and a lifelong friend of SMITH. CC-1 does not have any lawful employment or sources of income.[1] CC-1 has a 2001 misdemeanor aggravated domestic violence conviction and a 2015 felony conviction for operating while intoxicated/impaired – 3rd offense.

15.     In the summer of 2025, investigators received information about CC-1's drug dealing in Muskegon County, Michigan, and started an investigation. A confidential source (CS-1[2]) provided information to law enforcement regarding CC-1, specifically, that CC-1 was distributing large amounts of cocaine from his residence on Highland Street, Muskegon Heights, Michigan (Target Premises 1), and used a telephone number known to investigators (Target Phone 1) to facilitate his drug trafficking.

---

[1] CC-1 is the registered agent of an LLC that appears to be involved in property investments, but the Chase bank account for that LLC was closed on January 3, 2024. This is no indication that this LLC is an active business.

[2] CS-1 is providing information for judicial consideration on potential criminal charge(s). CS-1 has a criminal history that includes felony convictions, one of which is related to a crime of untruthfulness or dishonesty, however, that conviction is over ten years old. CS-1 has provided information which has been corroborated by investigators, a portion of which is documented in this continuation and/or witnessed by investigators and as such, his/her information as it relates to this investigation, is deemed to be reliable and credible.

16.    Target Phone 1 is subscribed in the name of CC-1 at Target Premises 1. CC-1's registered address with the State of Michigan, Secretary of State, is Target Premises 1.

17.    Between September 1 through September 7, 2025, investigators watched as CS-1 used his/her cell phone to place a telephone call to Target Phone 1. Investigators listened as CS-1 spoke to a male, who CS-1 identified as CC-1. During the call, CS-1 spoke with CC-1 regarding cocaine CC-1 had available for sale, including prices and quantities of cocaine.

18.    Through electronic surveillance, investigators have observed activity at Target Premises 1 that is consistent with drug trafficking, including individuals stopping by Target Premises 1 for a short period of time.  Not long after the CS-1 phone call with CC-1, on September 16, 2025, at 3:04 a.m., a semi-truck (with no trailer) arrived and parked on the street near Target Premises 1.  An individual known to investigators retrieved a large duffle bag from the passenger side of the semi-truck and carried the bag with two hands toward Target Premises 1. Approximately 16 minutes later, the individual walked away from the residence carrying a duffle bag in his right hand and a large bag over his shoulder, putting both in the passenger side of the semi-truck and then driving away. In my training and experience, and in the training and experience of other investigators involved in this investigation, this activity, especially given the time of day that it occurred, is consistent with a delivery of drugs and the acquisition of drug proceeds.

7

19.     Later that same morning, through electronic surveillance, investigators saw numerous individuals—some with prior drug convictions—arrive at Target Premises 1, where they would stay for a short period of time before departing. Investigators saw many individuals carrying items away from Target Premises 1 or concealing items under their shirt, all of which, again, is activity consistent with drug trafficking.

B.     SMITH facilitated the laundering of bulk cash drug proceeds from CC-1 in Michigan to promote and conceal drug trafficking crimes.

20.     On March 23, 2026, a Houston, Texas-based DEA investigator acting in an undercover capacity (UC-1) spoke to Lakento SMITH using telephone number 713-631-9122.[3] UC-1 posed as a money launderer who could arrange for a bulk currency pickup from SMITH or his associate(s).[4]   During the phone call(s), which were recorded, SMITH informed UC-1 that he was in Texas but that his business or "everything I got going on" is in Michigan. UC-1 requested that SMITH send a picture of a dollar bill with the understanding that the serial number on the bill would serve

---

[3] Investigators determined the user associated with this phone number in CashApp is "Lakento SMITH" and "$DBDBeans".

[4] DEA offices across the United States sometimes use Attorney General Exempt Operations (AGEOs) that allow investigators to launder suspected drug proceeds. This is accomplished by undercover investigator(s) picking up bulk currency in one geographic location and then depositing the bulk currency into the banking system before wire transferring the money to bank account(s) provided by suspect(s) of investigation. Through AGEOs, the DEA is authorized to conduct undercover financial transactions that transfer illegal drug proceeds from the point of sale to the point of origin to infiltrate and dismantle drug trafficking and money laundering organizations.

as a security token during a pickup of bulk currency.  UC-1 informed SMITH that his "girl" (another investigator acting in an undercover capacity (UC-2)), would meet with SMITH's associate in Muskegon, Michigan to acquire the "money," more specifically, "eighty thousand." SMITH told UC-1 that he had "a hundred eighty thousand on the street." SMITH told UC-1 that he had recently lost money in the mail and "It's gonna be a smooth transition. I actually be doing it down here."  SMITH further mentioned to UC-1, "I'll just go back to doing, you know what I'm saying, here. But everything I've got going on is up in Michigan." SMITH sent UC-1 the photograph below which depicts a dollar bill with serial number C14631277B:



21.    Based on my knowledge of the investigation and training and experience regarding the laundering of drug proceeds, I believe SMITH was telling UC-1 that he usually delivers bulk currency to money launderers in Texas. ("…I actually be doing it down here" and "I'll just go back to doing, you know what I'm saying, here…") Additionally, I believe SMITH told UC-1 that he had $180,000 invested in drugs that were to be sold. ("…a hundred eighty thousand on the street.") Finally, SMITH told UC-1 that his drug trafficking activities were primarily located in Michigan. ("…everything I've got going on is up in Michigan.") Based on these

9

statements and the totality of the investigation, I believe SMITH facilitates CC-1's drug supply and the laundering of their drug proceeds.

22.    On March 24, 2026, UC-1 spoke to SMITH to plan for UC-2 to meet SMITH's associate in Muskegon, Michigan.  At one point during a recorded phone call, SMITH requested UC-1 have UC-2 meet his associate at Target Premises 1, CC-1's residence in Muskegon Heights, but UC-1 declined. Eventually SMITH and UC-1 agreed that the meeting between UC-2 and SMITH's associate would happen at a Wal-Mart in the 49444 area code.

23.    On March 25, 2026, UC-1 contacted SMITH and told SMITH that UC-2 was at Wal-Mart located at 1879 E Sherman Boulevard, Muskegon, Michigan 49444. At approximately 10:25 a.m. on the same date (March 25, 2026), SMITH texted UC-1 and stated, "Okay he is on his way." At approximately 10:41 a.m., on the same date, CC-1 walked out of the front door of Target Premises 1, carrying what appeared to be a brown paper bag.  CC-1 got into his Toyota pickup truck and drove away from the residence. A photograph depicting CC-1 leaving his residence carrying what appears to be a brown paper bag is below:

10



24.    Investigators followed CC-1 electronically and at times, physically, as he traveled in his Toyota pickup truck directly from his residence to the Wal-Mart parking lot.  Investigators watched CC-1 park the Toyota pickup truck in the Wal-Mart parking lot.  Investigators then watched as CC-1 got out of his vehicle and walked to UC-2's vehicle. At around the same time, UC-1 texted SMITH "Tell you boy row 8," "Silver Volkswagen suv" (UC-2's vehicle), and "Get in passenger front seat."

25.    CC-1 got into and sat in the front passenger seat of UC-2's vehicle. According to UC-2, CC-1 appeared to be on a video call with another individual as he sat in UC-2's vehicle. UC-2 informed me that she recognized SMITH on CC-1's cell phone screen during the video call.

11

26.    CC-1 handed UC-2 a brown paper bag which contained two vacuum sealed bundles of United States Currency (USC), and the dollar bill with serial number C14631277B.  Once UC-2 confirmed the serial number with UC-1, CC-1 got out of the vehicle, returned to the Toyota pickup truck and drove directly back to his residence.  UC-2 subsequently drove away from Wal-Mart with the brown paper bag containing the two vacuum sealed bundles of USC and the dollar bill.  The USC in the two vacuum sealed bundles was subsequently deposited at a financial institution, into DEA undercover bank account. From there, the drug proceeds were transferred to bank accounts in Mexico. An official bank count of the USC contained in the two vacuum sealed bundles was rendered at $80,000. The photographs below depict CC-1[5] entering UC-2's vehicle with the brown paper bag, a photograph depicting UC-2 accepting the brown paper bag containing the $80,000 USC and the dollar bill, and a photograph depicting the two vacuum sealed bundles of USC and the dollar bill, in investigators' custody.

---

[5] Myself and other investigators involved in this investigation compared CC-1's Michigan driver's license photograph with that of the individual who entered UC-2's vehicle and positively identified that individual as CC-1. CC-1's face is obscured in the screenshots below because CC-1 is not charged in this criminal complaint.







27.     On April 20, 2026, UC-1 again spoke to SMITH.  UC-1 again posed as a money launderer who could arrange for a bulk currency pick up from SMITH or his associate(s). During the phone calls, which were recorded, SMITH informed UC-1 that he was "…supposed to pick up something again up north." SMITH told UC-1 "…I thought y'all folks be bringing something to me this time, too. Remember? Because he told that." UC-1 confirmed the bulk cash amount being picked up with SMITH. SMITH told UC-1 "…like, I got right now 50, but I've been trying to already chase a couple people out, and I still got product."  UC-1 requested SMITH pay the travel expenses for the money couriers up front. However, SMITH told UC-1 "…I don't even have all, everything is up there, that's why I don't have any of it, because I still was in the red, so now I'm just trying to accumulate every dime to take care of it up there… I have everything shipped up there. So I've been trying to take care of this tab for like shit, like a month." SMITH went on to tell UC-1 "…so but I'm saying right there, but the old guy up there I'm like try to call him and see you know saying where he could you know saying send or we can or whatever I'm saying but they'd be nervous of that cuz I have sent some shit over to Lazy[6] through the missus and then it was doing how they don't want their names on shit." Lastly, SMITH told UC-1 "…what Lazy said to me was that, because the thing is, like, I was talking to him, like, protect me as far

---

[6] Based on this investigation and SMITH's statements to UC-1, further described below, investigators believe "Lazy" is one of SMITH's sources of supply for controlled substances, likely cocaine, and that SMITH previously mailed drug proceeds to Lazy as payment for fronted drugs, but those drug proceeds got lost in the mail. Investigators have not identified a law enforcement seizure of SMITH's parcel containing drug proceeds, which he apparently mailed using SMITH'S WIFE's name.

15

as, because I'm fresh home… So we're just going to keep everything going, because, you know, I showed him that it was, like, 140, 150. I wiped that shit down. There was no excuses. So then we went. It got bigger. So I'm like, man, I got a system going… even if I got to have somebody fly the money down here, I would. But I was just saying, I want, we had agreed to him just to get it to me as well. So pick up, drop off, pick up, drop off. Because I need that line up there in Michigan…"

28.    Based on my knowledge of this investigation and my training and experience regarding money laundering of drug proceeds, I believe SMITH was expecting UC-1 to also coordinate the delivery of drugs to CC-1 ("…y'all folks be bringing something to me this time, too;" and "…I have everything shipped up there."). Additionally, SMITH can only pay the drug trafficking organization $50,000, even though he is attempting to collect drug debts from customers and sell drug inventory that is still on hand ("…I got right now 50, but I've been trying to already chase a couple people out, and I still got product."). Based on the recorded call, I believe SMITH uses couriers to try to distance himself from his illegal activities because he was recently released from federal prison ("…protect me as far as, because I'm fresh home…", "… even if I got to have somebody fly the money down here, I would."). Furthermore, the recordings indicate that CC-1 and SMITH use other people to send or receive drugs and money but those involved are concerned about being identified by law enforcement ("…I have sent some shit over to Lazy through the missus and then it was doing how they don't want their names on shit.").

16

29.     On April 23, 2026, UC-1 sent an image of a dollar bill to SMITH via MMS messaging with a serial number of D82720240A. On the morning of April 24, 2026, UC-1 reached out to SMITH over SMS messaging to arrange for the pickup of the additional $50,000. UC-1 directed SMITH to have his point of contact in Michigan—likely CC-1—meet UC-2 at 10:30 or 11:00 a.m. at the Wal-Mart parking lot, located at 1879 E Sherman Blvd, Muskegon, MI 49444.

30.     At approximately 11:10 a.m. on the same date, UC-1 sent an SMS text to SMITH asking if he was coming. SMITH responded immediately, "Yes in the next 5 mins." SMITH then sent another SMS text saying, "Silver truck" to UC-1.

31.     At approximately 11:07 a.m., investigators observed CC-1 exit Target Premises 1 and get into the silver Chevy Silverado bearing Michigan plate EDW1743. Investigators surveilled CC-1 physically and electronically while driving to the parking lot of 1879 E Sherman Blvd, Muskegon, MI 49444.

32.     While CC-1 was driving to 1879 E Sherman Blvd, Muskegon, MI 49444, SMITH sent an SMS message to UC-1 asking, "What car and color" at approximately 11:11 a.m. UC-1 replied, "Tan new path finder" at approximately 11:13 a.m.

33.     At approximately 11:21 a.m., investigators saw CC-1 pull up next to UC-2 in the parking lot and approach UC-2's vehicle on the passenger side for approximately 1 minute before returning to the Silverado and leaving the parking lot at approximately 11:23. Investigators surveilled CC-1 physically and electronically while he drove back to Target Premises 1, arriving at approximately 11:32 a.m.

17

34.    Investigators debriefed UC-2 after the meeting with CC-1. UC-2 identified CC-1 from their previous contact with him. UC-2 indicated that CC-1 provided him or her with a bag containing US currency. UC-2 provided CC-1 with the dollar bill bearing the serial number D82720240A. At approximately 11:23 a.m. SMITH sent an MMS message to UC-1 with a photograph of the same bill indicating that CC-1 had received the bill from UC-2.



35.    UC-2 met with DEA Special Agents and turned over the bag containing US Currency. Bank officials later counted the currency, confirming it was $50,000. DEA Special Agents deposited the funds into an undercover bank account at the request of DEA Houston, and ultimately transferred to bank accounts in Mexico.

36.    Based on these facts, SMITH directed CC-1 to specific locations and vehicles at specific times to deliver drug proceeds to a purported money laundering courier. SMITH also conspired with CC-1 to ensure the security of the delivery by transmitting images of specific dollar bill serial numbers. SMITH and CC-1 engaged in this money laundering conspiracy to promote and conceal controlled substance

distribution in the Western District of Michigan by paying for drugs already delivered.

C.    SMITH and CC-1 admitted their involvement in drug trafficking to UC-1.

37.    On June 9, 2026, at approximately 11:08 a.m. (EDT), UC-1 received a text message from SMITH, which stated, "don't forget about the met [sic] up today." UC-1 responded, "I didn't forget my man. Lets do tomorrow." The following day, June 10, 2026, at approximately 11:06 a.m. (EDT), UC-1 sent SMITH the following message, "12:30-1 oclock?" SMITH responded, "The address is 2016 Main" and "It's on you I am ready okay." UC-1 subsequently picked up SMITH in front of 2016 Main Street, Houston, Texas,[7] and drove to a Houston, Texas area restaurant. The conversation between SMITH and UC-1 in the car and at the restaurant was audio and video recorded.

38.    SMITH gave UC-1 a lengthy background of his drug trafficking history and current drug trafficking activities. SMITH told UC-1 that he was from Michigan and that he had received a Presidential pardon. SMITH explained that he was a "big guy when I left the streets twenty years ago," with a lot of connections (in Michigan). SMITH further explained that he "didn't really do business here (in Houston)," and that he sends everything up there," which UC-1 understood to mean that SMITH sends his drugs to Michigan for distribution. SMITH talked about an individual he identified only as "Lazy," whom UC-1 understood to be SMITH's source of supply of drugs.

---

[7] UC-1 positively identified SMITH from his Texas driver's license photograph.

39.    Specifically, SMITH told UC-1 that he "put an order in" with Lazy for "two batteries and 5 cans." According to SMITH, each "can" consists of "2 and a half tars in each can," and Lazy charges SMITH "twenty thousand for each can, which is eight thousand per tar." SMITH explained that when they "get up there" (to Michigan), SMITH charges twenty thousand per "tar." SMITH also told UC-1 that the batteries have "six in each one." Based on my training and experience, the training and experience of other investigations involved in this investigation, including UC-1, investigators believe that SMITH was using coded language to refer to fentanyl and heroin. Specifically, investigators believe that SMITH told UC-1 that he is expecting to receive, or has received, from "Lazy," a portion of 12 kilograms of fentanyl (in two batteries, "six in each one"), as well as 12.5 kilograms of black tar heroin (in five cans, "2 and a half tars in each can"), that he intends to distribute in Michigan, likely through CC-1.

40.    Later in the conversation, SMITH told UC-1 that the "fentanyl is new" to him; SMITH has "guys that want it," but that he needed UC-1 to help him work on getting the "t-shirts," which SMITH told the UC-1 meant "coke." Additionally, while SMITH admitted to UC-1 that distributing "fentanyl is new" to him, he really wanted to distribute "coke" or cocaine.

41.    SMITH told UC-1 that his main associate in his trucking company was his former prison cellmate. SMITH showed UC-1 a picture of his trucking company's

box truck. I believe this truck to be the same one purchased with drug proceeds discussed above. SMITH told UC-1 that police had searched his truck.[8]

42.     At one point during the meeting, SMITH expressed his willingness to use violence to protect his drug trade, stating specifically to UC-1, "I would never put you in no situation, I would never put you in no harm's way because I am always cool, I got a crew up there, if anybody plays with me up there, they going to die, because I got to do it for the smallest amount of money."

43.     During the meeting, SMITH told UC-1 that he would be visiting Muskegon soon for the purpose of attending a funeral.

44.     During the meeting, SMITH used what appeared to UC-1 to be a Facetime call to CC-1.[9] During the call, SMITH and CC-1 discussed prices for kilogram amounts of cocaine.

45.     Below is SMITH's Texas driver's license photograph and a screenshot from the recorded video of SMITH at the meeting with UC-1:

---

[8] As discussed in more detail below, on March 13, 2026, after CC-1 drove from Target Premises 1 to a truck stop near Dayton, Ohio, investigators located a white box truck registered to BB SMITH in that truck stop parking lot after CC-1 left and returned toward Target Premises 1. As the BB SMITH truck traveled south, Kentucky State Trooper stopped it and searched it, but found no contraband or bulk currency.

[9] UC-1 recognized CC-1 when he compared the individual he saw on SMITH's phone screen with CC-1's Michigan driver's license photograph.



46.    On June 30, 2026, UC-1 and SMITH met again, this time in UC-1's vehicle, which was parked outside SMITH's apartment building at 2016 Main Street, Houston, TX 77002. During the meeting, UC-1 called his "uncle," whom he was introducing to SMITH for the purpose of establishing a new supply of cocaine for SMITH and his co-conspirators in Detroit and Muskegon, Michigan, and SMITH called CC-1 on Facetime so he could participate in the meeting. A portion of that meeting, which lasted around 50 minutes, is described below.

47.    After UC1's uncle got off the phone, SMITH told UC-1 he was "sending 20 a week up there from prison . . . to him," and, over Facetime, CC-1 corrected SMITH, saying "28," and SMITH said, "Ok, my bad, 28." SMITH also told UC-1 that he likes "clean money," and that it "counts faster," and "you hold it smaller." SMITH told UC-1, "whenever you ready, my operation in Michigan, I don't do nothing here." SMITH told UC-1 that CC-1 is "very important to me, he's got a perfect record . . . he's never

been locked up . . . his name's [initials of CC-1]." SMITH told UC-1 that "he's old school . . . he's got my best interest. I know he really unconditionally loves me." SMITH told UC-1 "we can start with a couple" and "right now we got a couple dollars up there." Over Facetime, CC-1 said, "can't have no taste . . . can't have no taste." UC-1 asked about the people that buy from CC-1 and SMITH, "they want it to make rock?" CC-1 responded, "Yes, they putting it in the water." SMITH followed up by saying, "they going to cry about the grams being lost." CC-1 said, "the product gotta be . . . at least anywhere from 90 to 100 percent." CC-1 explained, "drop 28 in there, it needs to come back 28 . . . . They been cooking for years." SMITH said, "It's a party drug, the cocaine. I really . . . I want the cocaine more than I want the other shit."

48.     Based on the context of the conversation, my training and experience, the training and experience of other investigators, and the investigation to date, investigators believe the following about the above portion of the conversation between SMITH, CC-1, and UC-1:

a. SMITH told UC-1 that while SMITH was in prison, he was facilitating, through CC-1 in Muskegon County, the distribution of 20 kilograms of cocaine per week, CC-1 corrected SMITH and said it was 28 kilograms of cocaine, and SMITH agreed ("sending 20 a week up there from prison . . . to him," and, "28," "Ok, my bad, 28.").

b. SMITH described his preference for "clean money" as opposed to money off the street because it counts faster, and bills in larger dollar amounts, because it is easier to conceal and smuggle, which in my training and experience, is

consistent with laundering drug money to conceal its source ("clean money," "counts faster," "you hold it smaller."). In my training and experience, drug traffickers and money launders will often use casinos to swap street money for clean money, including bills in larger denominations. According to investigators involved in this investigation, through electronic and physical surveillance, CC-1 regularly frequents the Gun Lake Casino in Michigan.

c. SMITH explained to UC-1 that his drug trafficking operation is based in Michigan, and that he doesn't do anything in Houston because he is on federal supervised release ("whenever you ready, my operation in Michigan, I don't do nothing here.").

d. SMITH described his relationship with CC-1 as very important because CC-1 has a relatively minor criminal history compared to SMITH, who is on federal supervised release, that they are loyal to one another, and that SMITH trusts CC-1 ("very important to me, he's got a perfect record . . . he's never been locked up . . . his name's [initials of CC-1]." "he's old school . . . he's got my best interest. I know he really unconditionally loves me.")

e. SMITH told UC-1 that he has money to spend on a cocaine shipment now ("we can start with a couple" and "right now we got a couple dollars up there.").

49. SMITH and CC-1 described in detail how they were looking for high quality cocaine ("can't have no taste . . . can't have no taste." "the product gotta be . . . at least anywhere from 90 to 100 percent."). SMITH and CC-1 explained to the UC-1

24

that their customers buy powder cocaine to cook it into crack cocaine, or cocaine base ("Yes, they putting it in the water." "They been cooking for years.") When powder cocaine is good quality and cooked into crack cocaine, the weight of the powder cocaine should be the same at the beginning as the weight of the crack cocaine at the finish ("they going to cry about the grams being lost" "drop 28 in there, it needs to come back 28").

50.    SMITH explained he prefers to sell cocaine over other drugs like fentanyl or heroin, because cocaine is a popular party drug, which I know from my training and experience, while still dangerous, is less dangerous than fentanyl or heroin ("It's a party drug, the cocaine. I really . . . I want the cocaine more than I want the other shit.")

51.    SMITH's statements to UC-1 during the June 10, 2026 and June 30, 2026 meetings are direct evidence of SMITH and CC-1's drug trafficking and money laundering conspiracy, which is corroborated by the financial network that exists among them.

D.    SMITH said he lost drug proceeds in the mail and historical records show CC-1 shipped parcels to SMITH through SMITH'S WIFE.

52.    US Postal Inspectors conducted a search of USPS business records related to SMITH and SMITH'S WIFE address in Houston, Texas, 2016 Main Street, Apt 720, Houston, Texas 77002, and identified between May 30, 2025 and March 2, 2026, ten retail parcels were shipped from Muskegon, Michigan to SMITH and SMITH'S WIFE'S apartment:

25

a.    Six of these parcels were sent by USPS Priority Mail Express, including one parcel that was shipped from Muskegon, Michigan on February 27, 2026, destined for "[SMITH'S WIFE]" at 2016 Main Street Apt 720, Houston, TX 77002.  This USPS Priority Mail Express parcel had a return address of Target Premises 1 (CC-1's residence in Muskegon Heights).  USPIS noted that an individual who identified herself as SMITH'S WIFE contacted the United States Postal Service to inquire about a delay in the receipt of this USPS Priority Mail Express Mail parcel.  SMITH'S WIFE provided USPS with a phone number and email address that belong to SMITH'S WIFE.  SMITH'S WIFE also indicated the parcel was shipped from CC-1.  The remaining four parcels were sent by USPS Ground Advantage service.

b.    USPIS investigators were able to confirm the return address of four of the above-mentioned USPS Priority Mail Express parcels as Target Premises 1 (CC-1's residence in Muskegon Heights), with three listing the sender as variations of CC-1's name or initials.

c.    Further, five of the six USPS Priority Mail Express parcels weighed over eight ounces, with the majority of these weighing over one pound.

53.    While none of the above ten parcels were able to be inspected or seized, USPIS investigator training and experience, as well as drug-trafficking intelligence information gathered by the USPIS have demonstrated that the USPS Priority Mail Express and Priority Mail are frequently utilized by drug traffickers for shipping controlled substances and drug proceeds. These methods are favored because of the

speed, reliability, free telephone and internet package tracking service, and the perceived minimal chance of detection. Priority Mail Express was originally intended for urgent business-to-business correspondence and Priority Mail for typical business correspondence with the majority of customers utilizing computer-generated address labels. Priority Mail Express is seldom used for individual-to-individual correspondence.

E.      CC-1 reported no income but sent thousands of dollars to SMITH to promote and conceal their drug trafficking crimes.

54.      Investigators have served subpoenas on financial institutions associated with SMITH, SMITH'S WIFE, and CC-1, which revealed additional significant information about SMITH's money laundering activities.

55.      CC-1 reported no income to the State of Michigan for the years 2023 and 2024. Nonetheless, during my financial investigation, I located a PNC bank account held by CC-1 in trust for an individual believed to be his adult son. From November 17, 2023 through September 17, 2025, CC-1 made 105 cash deposits into his PNC bank account totaling $167,264.45, and many of the deposits were in round dollar amounts. Many of the deposits were clustered around certain dates, including the following:

a)      9/2/25 through 9/5/25, 6 cash deposits totaling $14,160.00;

b)      8/22/25 through 8/27/25, 6 cash deposits totaling $10,440.00;

c)      8/06/25 through 8/11/25, 5 cash deposits totaling $11,180.00;

d)      6/30/25 through 7/3/25, 10 cash deposits totaling $20,000.00; and

e)      4/14/25 through 4/17/25, 6 cash deposits totaling $12,000.00.

56.    I know from my training and experience conducting drug investigations and based on the training and experience of other investigators involved in this investigation, that it is common for drug traffickers to generate significant cash proceeds from drug sales. To avoid detection by law enforcement, drug traffickers will structure deposits to cumulatively deposit more than $10,000.00 in a short period of time without triggering bank alert systems. This results in drug traffickers evading questioning from banks and the filing of Currency Transaction Reports with the Financial Crimes Enforcement Network of the U.S. Treasury Department.  Based on the facts documented throughout this affidavit, I believe CC-1 structured a large amount of cash deposits generated from his drug trafficking activity.

57.    From July 1, 2025 through July 7, 2025, CC-1 made the following deposits into his PNC account:

| Date | Amount | Method |
|---|---|---|
| 7/2/25 | $5,700.00 | Cash Deposit at ATM |
| 7/2/25 | $2,000.00 | Transfer from Cash App |
| 7/2/25 | $2,140.00 | Cash Deposit at ATM |
| 7/2/25 | $1,460.00 | Cash Deposit at ATM |
| 7/3/25 | $1,860.00 | Cash Deposit at ATM |
| 7/3/25 | $1,140.00 | Cash Deposit at ATM |
| 7/5/25 | $4,000.00 | Branch Cash Deposit |
| **Totals** | **$18,300.00** | |

58.    CC-1's cash deposits from July 2, 2025 through July 5, 2025 appear to be structured. All these ATM cash deposits occurred at the same ATM at 878 W Norton Avenue, Muskegon, MI. The deposits noted above funded a $10,010.00 withdrawal from CC-1's account on July 5, 2025. The withdrawal slip was dated July 5, 2025 but appeared to post to the account on July 7, 2025.

59.     Using a deposit slip dated July 5, 2025, SMITH'S WIFE deposited $25,000.00 of cashier's checks into her Chase account ending 2325, over which she had sole signatory authority. Both cashier's checks were purchased by CC-1 and made payable in the name of SMITH'S WIFE. One cashier's check was from PNC bank for $10,000.00, and the other cashier's check was from Comerica Bank for $15,000.00. The PNC cashier's check was dated July 7, 2025, and the Comerica Bank cashier's check was dated July 5, 2025. SMITH'S WIFE'S deposit slip was dated July 5, 2025. It appears the PNC cashier's check was postdated which may have been because July 5, 2025, was a Saturday and July 7, 2025, was a Monday. Based on these circumstances, I believe CC-1 used his structured cash deposits to purchase the PNC cashier's check on July 5, 2025.

60.     SMITH'S WIFE'S Chase account had a balance of $220.56 on June 30, 2025. The account was funded on July 1 and July 2, 2025 by two Zelle payments from CC-1 totaling $5,000.00 and an apparent payroll deposit of $653.62. On July 7, 2025, SMITH'S WIFE deposit of the cashier's checks posted in her account. SMITH'S WIFE'S balance after depositing the cashier's checks was $27,784.96. Of those funds, only the original balance of $220.56 and payroll deposit of $653.62 appear to be from potentially lawful sources. Therefore, despite the comminglingly of funds, SMITH'S WIFE'S account had approximately $26,910.78 of illicit drug proceeds from CC-1 contained in the total balance of $27,784.62.

61.     Between July 7, 2025 and August 8, 2025, after the deposit of the $25,000 in cashier's checks, SMITH'S WIFE received another $3,000 from CC-1

29

through Zelle, which I believe, based on my training, experience, and familiarity with the investigation, to be additional drug proceeds.

62.    During this same period, SMITH'S WIFE conducted the following cash withdrawals from her account:

| Date | Cash Withdrawal Amount | Location |
|---|---|---|
| 07/16/2025 | $500.00 | ATM |
| 07/28/2025 | $1,000.00 | ATM |
| 07/29/2025 | $1,000.00 | ATM |
| 08/08/2025 | $10,000.00 | Unknown |
| TOTAL | $12,500.00 | |

63.    SMITH is the owner of BB SMITH TRUCKING LLC (BB SMITH). According to a commercial database, BB SMITH was registered with the State of Texas on July 31, 2025—weeks after SMITH was released from federal prison. SMITH was the listed registered agent. On August 6, 2025, SMITH opened a Chase Business Complete Checking account for BB SMITH at JP Morgan Chase Bank. SMITH was the sole account signer. The listed account address was 2016 Main Street Apartment 720, Houston, Texas 77002. The account was initially funded on August 6, 2025, by a $200.00 Zelle payment from SMITH's WIFE.

64.    On August 8, 2025, SMITH deposited $17,000.00 in cash into the BB SMITH Chase Business Complete checking account. This deposit occurred the same day as SMITH'S WIFE's $10,000.00 withdrawal from her Chase account. On the same day, SMITH purchased a cashier's check for $15,000.00 payable to USA Auto Planet[10]

---

[10] USA Auto Planet is a specialized used commercial and heavy-duty truck dealership based in Houston, Texas, where SMITH currently lives. According to its website, the

using funds from the cash deposited into the BB SMITH account. The BB SMITH Chase account was subsequently closed on August 14, 2025. The account was only open for eight days, from August 6, 2025 through August 14, 2025.

65.    Based on the foregoing facts, SMITH conspired with CC-1, to cause CC-1 to purchase cashier's checks payable to SMITH's WIFE to conceal the source, control, or ownership of the proceeds of specified unlawful activity, drug trafficking. Then SMITH used those illegal proceeds to purchase a cashier's check from Chase bank for $15,000.00, constituting a monetary transaction in property derived from criminal activity.

66.    On March 13, 2026, investigators conducted electronic surveillance of CC-1 as he drove from Target Premises 1 in Muskegon Heights to a gas station in the Dayton, Ohio area. CC-1 stayed at the gas station for a short period of time and then returned to Target Premises 1. Agents identified a white box truck in parking lot of the gas station bearing Texas registration WVD1993. Searches of law enforcement records showed the box truck was owned by BB SMITH and had a lien from USA Auto Planet dated August 8, 2025. The truck was surveilled and later stopped by law enforcement and searched. No contraband or cash was discovered in the truck.

67.    From March 22, 2025, through January 1, 2026, CC-1 sent SMITH'S WIFE $42,260.00 via Zelle. From October 14, 2025, through April 15, 2026, CC-1 sent

---

company sells used trucks and helps owner-operators grow their fleet or start their hauling operations. https://www.usaautoplanet.com

31

BB SMITH $44,000.00 via Zelle. From September 4, 2025, through March 3, 2026, CC-1 paid SMITH $34,440.00 via Cash App. On January 27, 2026, CC-1 sent SMITH'S WIFE $2,000.00 via Apple Cash. From December 1, 2025, through February 8, 2026, CC-1 paid SMITH $31,501.00 via Apple Cash. In total from March of 2025 through April of 2026, CC-1 has sent SMITH and SMITH'S WIFE approximately $154,201.00 via Zelle, Cash App, and Apple Cash. Over the same period SMITH'S WIFE sent SMITH, or accounts under SMITH's control, $10,640.00 via Zelle and Apple Cash. During this period, I only located one payment from SMITH or SMITH'S WIFE to CC-1 for $160.00. The day prior to the transaction, CC-1 sent SMITH'S WIFE $160.00. Based on this, it appears the payment from SMITH'S WIFE to CC-1 was only a return of a small amount of money to CC-1. This corroborates the other evidence gathered that CC-1 is responsible for selling drugs in and returning drug proceeds from Michigan, as facilitated by SMITH.

## CONCLUSION

68.     SMITH is conspiring with CC-1 and other individuals, known and unknown, to launder monetary instruments. Specifically, SMITH and CC-1 have agreed and conspired to: move bulk cash drug proceeds totaling at least $130,000 in "clean money," i.e., U.S. currency in larger denominations as depicted above, from Michigan to Mexican bank accounts to promote the drug trafficking conspiracy; and SMITH directed CC-1 to transfer thousands of dollars in drug proceeds to SMITH'S WIFE, which CC-1 did through structured cash deposits to evade reporting

32

requirements, and cashier's checks, which SMITH then used to buy the white box truck, to conceal the source and origin of the drug proceeds.

69.    Based on the above information, there is probable cause to believe that beginning on a date unknown but from at least May 30, 2025, in the Western District of Michigan, Southern District of Texas, and elsewhere, LAKENTO BRIAN SMITH conspired persons known and unknown to launder monetary instruments, in violation of 18 U.S.C. § 1956(h). I respectfully request that the Court issue a warrant for SMITH's arrest.